## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| PITCAIRN PROPERTIES | ) |  |
| HOLDINGS, INC., | ) | Case No. 10-12764 (CSS) |
|  | ) |  |
| Debtor.[1] | ) |  |
|  | ) |  |
| PITCAIRN PROPERTIES | ) |  |
| HOLDINGS, INC., | ) |  |
|  | ) |  |
| Appellant, | ) |  |
|  | ) |  |
| vs. | ) | Civil Action No. 10-00773-UNA |
|  | ) | Civil Action No. 10-00774-UNA |
| PPH INVESTMENTS, LLC, PPH | ) |  |
| INVESTMENT MANAGEMENT, LLC, | ) |  |
| ERIC L. BLUM, ELB CAPITAL | ) |  |
| MANAGEMENT, LLC, FB CAPITAL | ) |  |
| PARTNERS, L.P., AND MARSH | ) |  |
| HAWK CAPITAL MANAGEMENT LLC, | ) |  |
|  | ) |  |
| Appellees. | ) |  |
|  | ) |  |

## APPELLEES' OBJECTION TO EMERGENCY MOTION OF DEBTOR-APPELLANT FOR STAY PENDING APPEAL OF ORDERS: (A) DISMISSING CASE; AND (B) REMANDING CHANCERY COURT ACTION AND VACATING AUTOMATIC STAY

PPH Investments, LLC ("PPH"), PPH Investment Management, LLC, Eric L.

Blum, ELB Capital Management, LLC, FB Capital Partners, L.P., and Marsh Hawk

Capital Management LLC, (collectively, "Appellees"), by and through their undersigned

counsel, hereby file their objection ("Objection") to the Emergency Motion of Pitcairn

Properties Holdings, Inc., a Delaware corporation (the "Debtor-Appellant") for Stay

---

[1] The last four digits of the Debtor's federal tax identification number are 3452. The address for the Debtor is 165 Township Line Road, Jenkintown, PA 19046.

Pending Appeal of Orders: (A) Dismissing Case; and (B) Remanding Chancery Court Action and Vacating Automatic Stay (the "Motion") and, in support hereof, state as follows:

## INTRODUCTION

1.     On June 24, 2004, pursuant to a Series A Convertible Redeemable Preferred Stock Purchase Agreement (the "Stock Purchase Agreement"), PPH invested $50,000,000 in the Debtor-Appellant.  In return for its investment of $50,000,000, PPH received  shares of Series A Convertible Preffered Stock (the "Preferred Stock") with the rights and preferences set forth in the Preferred Stock Certificate of Designation (the "Certificate"), which under the Delaware General Corporate Law effects an amendment to the Debtor-Appellant's Certificate of Incorporation.  A copy of the Certificate is attached hereto as Exhibit A.  The Certificate provides PPH with various rights with respect to the stock and certain actions or nonactions by the Debtor-Appellant.

2.     The Debtor-Appellant has been seeking through its actions over the past two months to prevent its largest equity holder – the preferred shareholder - from exercising its bargained for shareholder rights under the Certificate and Delaware corporate law.  The specific right sought to be exercised by the preferred shareholder is its election, upon the occurrence of certain events which have occurred, of additional board members of the Debtor-Appellant -- the result of which would be that the preferred shareholder could name the majority of the newly constituted board -  the so called "Board Stacking Right".

3.     The evidence presented at the Bankruptcy Court below clearly establishes, as the Bankruptcy Court concluded, that the Chancery Court Action and the bankruptcy

proceeding were commenced to obtain leverage over the preferred shareholder in a fight for control over the company.  The current board of the Debtor-Appellant determined that it was likely to receive imminently an unfavorable ruling from the Chancery Court and thus shopped for a more favorable forum – and further delay –  in the Bankruptcy Court. After the Bankruptcy Court was unreceptive to the current board's forum shopping, the current board is now attempting to shop for yet another forum to resolve its shareholder dispute.

## PROCEDURAL BACKGROUND

4.      On June 25, 2009, pursuant to the Certificate, PPH sent a "Redemption Request" to the Debtor-Appellant requiring it to redeem all of the Preferred Stock. Pursuant to the Certificate, the redemption would occur in seven tranches over four years, but must begin within one year of the Redemption Request. If redemption did not commence timely and was not cured within 45 days of default, the preferred shareholder could exercise the Board Stacking Right.  Further, unless and until fully redeemed, the Preferred Stock remains outstanding with all rights, privileges and preferences set forth in the Certificate.

5.      However, by fall of 2009, Debtor-Appellant asserts it was "experiencing a deteriorating cash flow position," and adopted a "cash conservation plan" and ceased paying PPH the quarterly dividends to which it was entitled, beginning with the third quarter of 2009.  On July 1, 2010, PPH notified the Debtor-Appellant that, in light of the Debtor-Appellant's failure to redeem the first tranche of preferred shares, PPH intended to exercise its Board Stacking Right.

6.      On July 20, 2010, the Debtor-Appellant filed an action in the Chancery

Court of the State of Delaware (the "Chancery Court Litigation") against PPH in order to avoid what the Debtor-Appellant claimed would be "the disastrous consequences that would result from the [PPH]'s exercise of the Board Stacking Right." *See* ¶ 47, Declaration of Salah A. Mekkaway in Support of First Day Motions (the "Mekkaway Declaration") [Bankruptcy Court D.I. No. 2]. A copy of the Mekkaway Declaration is attached hereto as Exhibit B.

       7.       The Debtor-Appellant filed a motion for a preliminary injunction to enjoin PPH from exercising the Board Stacking Right. The Chancery Court expedited the consideration of the Chancery Court Action and was willing to decide the preliminary injunction issue on Sunday, August 8, 2010. The Defendants, however, consented to refrain from exercising the Board Stacking Right and to allow the issues to be fully briefed prior to the Chancery Court issuing a decision. The briefing in the Chancery Court has been fully completed and the Chancery Court was set to decide the preliminary injunction issue at 10:00 a.m. on September 3, 2010. A copy of the Brief of Appellees in the Chancery Court is attached hereto as Exhibit C. If the Debtor-Appellant were to be successful at the preliminary injunction hearing any of the potential harm it alleges, would be alleviated. On September 1, 2010 (the "Petition Date"), in an attempt to avoid the September 3 preliminary injunction hearing, the Debtor-Appellant filed a voluntary petition (the "Chapter 11 Petition" and the "Chapter 11 Case") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[2] A copy of the Chapter 11 Petition is attached hereto as Exhibit D.

       8.       At the "first day" hearing held on September 2, 2010 (the "First Day

---

[2] PPH does not in any way concede that the automatic stay applies to the exercise of their corporate governance rights, the continuation of the Chancery Court Action and the exercise of the Board Stacking Right.

Hearing"), the Bankruptcy Court issued a show cause bench order (the "<u>Show Cause Order</u>") directing the Debtor-Appellant to show cause why the Chapter 11 Case should not be dismissed by the Bankruptcy Court as a bad faith filing and scheduled another hearing for September 3, 2010 (the "<u>September 3 Hearing</u>").   PPH submitted its Statement of Position Relating to Order to Show Cause [Bankruptcy Court D.I. No. 16] and the Debtor-Appellant filed its Memorandum of Law Submitted in Connection with the Court's September 2, 2010 Oral Ruling to Show Cause [Bankruptcy Court D.I. No. 17] (the "<u>Memorandum</u>").  At the September 3 Hearing, the Bankruptcy Court considered the parties' pleadings and the oral and documentary evidence presented, and ruled that the Chapter 11 Case shall be dismissed for bad faith under 11 U.S.C. §1112(b).   The Bankruptcy Court further separately ordered that the Chancery Court Action be remanded and to proceed unimpaired in any way by the automatic stay, if it were even applicable.

9.      At the conclusion of the September 3 Hearing, the Debtor-Appellant made an oral motion for stay pending appeal, which the Bankruptcy Court set for telephonic hearing on September 7, 2010 (the "<u>September 7 Hearing</u>").   At the conclusion of the September 7 Hearing, the Bankruptcy Court denied Debtor-Appellant's motion for stay pending appeal, finding that the Debtor-Appellant had not met its burden in favor of the stay pending appeal – the same standard that this Court is now asked to consider.

## RELEVANT FACTS ON THE RECORD BELOW

10.      Some of the relevant facts in this matter as admitted by the Debtor-Appellant through its pleadings and adduced at the September 3 Hearing are as follows:

- Debtor-Appellant admits "[i]n order to avoid the [what it contended were] disastrous consequences that would result from the [PPH]'s exercise of the Board Stacking Right, [the Debtor] commenced an action in the Delaware Court of Chancery by filing a complaint against Blum, the Preferred Stockholder and other related entities."  *See* ¶ 47, Mekkawy Decl.

- Debtor-Appellant admits that it "could not face the risk that the Vice Chancellor might deny the requested preliminary injunction and allow the Preferred Stockholder to exercise the Board Stacking Right immediately." *See* ¶ 48, Mekkawy Decl.

- Debtor-Appellant admits it is solvent and, as of December 31, 2009, it reported that the book value of its assets exceeded its liabilities by approximately $30 million. *See* ¶ 31, Mekkawy Decl.

- Debtor-Appellant is not insolvent.  As of December 31, 2009, the book value of PPHI's assets exceeded its liabilities by approximately $30 million. Moreover, even using the lowest valuation of the property owned by the Joint Ventures and PPHI's interests therein, the current value of PPHI's assets still exceeds its total liabilities by a wide margin. *See* ¶ 2(E), Debtor-Appellant's Disclosure Statement. [Bankruptcy Court D.I. 15] (the "Disclosure Statement"). A copy of the Disclosure Statement is attached hereto as Exhibit E.

- The Debtor-Appellant admits that under its cash flow projections, it has positive cash balance through August 2012 with additional liquidity if and when assets are sold in the normal course of business. *See* Complaint at ¶ 138.  A copy of the Complaint is attached hereto as Exhibit F.

- The Debtor-Appellant lists only 6 unsecured creditors on its List of Top 20 Unsecured Creditors.

- The Debtor-Appellant admits it is current on its interest obligation to Wells Fargo – "PPHI [the Debtor-Appellant] is indebted to Wells Fargo Bank, N.A., as successor to Wachovia Bank, N.A., pursuant to a letter of credit and related loan agreement with PPI [a subsidiary], of which PPHI is a guarantor, and a line of credit to PPHI.  PPI and PPHI are in default of these loans because, in late 2009, it was unable to pay the amount drawn on the letter of credit and the principal balance of the loan to PPHI at its maturity. At the time, PPHI had insufficient cash, and could not generate sufficient cash from the sale of real estate interests in a difficult market, to pay the amounts due to Wells Fargo.  **As of the Petition Date, the outstanding principal amount due to Wells Fargo was approximately $10.3 million, and interest has been paid currently.** PPHI's debt to Wells Fargo is secured only by a security interest in a note owed by a shareholder of PPHI, which is of little value." *See* ¶ 2(E), Disclosure Statement.

- The Debtor-Appellant admits that its guaranty liability is speculative at best – "Finally, as noted above, the Joint Ventures each have entity-level financing for their real estate and the development thereof. These obligations are generally secured by mortgages and/or other liens on the property owned by the Joint Ventures. As of December 31, 2009, the total amount of outstanding obligations of the Joint Ventures was $370,775,000. However, **only a small portion of this**

**total is guaranteed by PPHI. In addition, PPHI believes that the value of the property subject to mortgages securing the Joint Venture obligations of which PPHI is a guarantor is sufficient to satisfy most or all of the outstanding amount of those obligations.**" *See* ¶ 2(E), Disclosure Statement.

- Lastly, and perhaps most instructive in this Court's determination today, is that Section 4.6 (c) of the Debtors' proposed Chapter 11 Plan of Reorganization [Bankruptcy Court D.I. 14] (the "<u>Plan</u>") provides:

> <u>Termination of Rights</u>. From and after the Confirmation Date, the Certificate of Designations of PPHI, dated June, 24, 2004, and all other documents relating to the Preferred Stock and the rights of the holders thereof shall be null and void and of no further force and effect. The holders of Preferred Stock shall not thereafter be entitled to exercise any remedies available to them under such documents and shall only be entitled to the payments described herein. A copy of the Plan is attached hereto as <u>Exhibit G</u>.

## OBJECTION AND BASIS THEREFORE

11.    The Federal Rules of Bankruptcy Procedure provide that bankruptcy courts may stay their own orders pending appeal.  Rule 8005 provides that, generally, a stay motion must be presented to the bankruptcy court in the first instance.  Fed. R. Bankr. P. 8005.  The purpose of such a stay is to "preserve the status quo where, in its sound discretion, the court deems the circumstances so justify." *In re VF Brands, Inc.*, 282 B.R. 134, 137 (Bankr. D. Del. 2002) (internal quotation marks omitted) (referring to stay pending appeal under Rule 62(c)).  Courts apply a four-part test to determine whether a particular order should be stayed pending appeal: (i) whether the appellant is likely to succeed on the merits of an appeal; (ii) whether the appellant will suffer irreparable injury if the stay is not granted; (iii) whether a stay would substantially harm the other parties to the litigation; and (iv) whether a stay is in the public interest. *In re Hudson's Coffee, Inc.*, No. 05-60470 (NLW), 2008 WL 4837285, at * 2 (Bankr. D.N.J. Oct. 31, 2008); *see also Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987));

*United States v. Carlin*, Civ. No. 06-1906, 2006 WL 3208675, at *1 (E.D. Pa. Nov. 3, 2006); *Camden Ordnance Mfg. Co. v. United States Trustee* (*In re Camden Ordnance Mfg. Co.*), 238 B.R. 292 (E.D. Pa. 1999).  In applying this test, courts have emphasized that "no single factor is outcome determinative. Rather, the court must balance all the elements in order to reach an appropriate determination." *Hudson's Coffee*, 2008 WL 4837285 at *2.  The factors should be considered, moreover, based on the specific facts and circumstances of the particular case. *Republic of the Philippines*, 949 F.2d at 658.

12.    The stay requested by the Debtor-Appellant should be denied because the facts of the present case do not satisfy the test as articulated in *Hudson Coffee*.

1.     **APPELLANT IS NOT LIKELY TO SUCCEED ON THE MERITS ON APPEAL**

*A.*     *Dismissal Order*

13.    Courts have consistently held that the filing of a chapter 11 petition in "bad faith" constitutes cause for dismissal under section 1112(b).  *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 381 (8th Cir. 2000) ("bad faith alone is sufficient to warrant dismissal, regardless of the possibility of reorganization"); *SGL Carbon*, 200 F.3d at 160 ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."); *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994).  The requirement that bankruptcy cases be filed in good faith "has long been the policing mechanism of bankruptcy courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy reorganization philosophy and for no other purpose." *In re Island Helicopters, Inc.*, 211

8

B.R. 453, 462 (Bankr. E.D.N.Y. 1997) (emphasis added). Even the appearance of
impropriety threatens the integrity of the bankruptcy process and should not be
countenanced. *See In re Calder*, 93 B.R. 739, 740 (Bankr. D. Utah 1988). As the court
in *Calder* explained:

> The Court also believes that it has both inherent and statutory
> authority to protect the integrity of this Court. Under 11 U.S.C. § 105(a)
> the Court is given the power to take any action or make any determination
> necessary or appropriate to prevent an abuse of process. For this Court to
> allow even an appearance of abuse would be a severe obstruction of those
> policies fundamental to the Code. To prevent such abuse the Court shall
> assume a strict and critical stance towards any maneuvers or schemes
> which would have the effect of undermining the integrity of the system.

*Id.* at 740.

14. The Third Circuit in *Integrated* has stated that two inquiries are
"particularly relevant to the question of good faith: (1) whether the petition serves a valid
bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the
debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation
advantage." *In re Integrated Telecom Express, Inc*., 384 F.3d at 119-120 (finding that the
debtor did not file its petition in good faith). The burden is on the debtor to establish that
it filed its petition in good faith. *See In re Integrated Telecom Express, Inc.*, 384 F.3d at
118; *In re PPI Enters (U.S.), Inc.*, 324 F.3d at 211.

15. Similarly, in *SGL Carbon*, 200 F.3d at 165-66, the Third Circuit held that
the "good faith" inquiry must focus, at its core, on whether the debtor filed for
bankruptcy to serve the fundamental goal of chapter 11 – reorganization:

> *[A] Chapter 11 petition is not filed in good faith unless it*
> *serves a valid reorganizational purpose*. . . . It is easy to
> see why courts have required Chapter 11 petitioners to act
> within the scope of the bankruptcy laws to further a valid
> reorganizational purpose. Chapter 11 vests petitioners with

considerable powers - the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. - that can impose significant hardship on creditors.  When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified.  But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code."

*Id*. at 165-66 (emphasis added).

16.     The Chapter 11 Case surely fails under *Integrated Telecom Express*, as the sole reason for the filing was  to obtain a tactical litigation advantage.  Furthermore, there is no intention by the Debtor to preserve a going concern or maximize the value of the debtor's estate.  More specifically, the Debtor did not need to file in order to "create or preserve some value that would otherwise be lost-not merely be distributed to a different stakeholder-outside of bankruptcy." *Id.*  By the Debtor's own admission, it is solvent.

17.     The Chapter 11 filing also fails to meet the primary standard for good faith articulated in *SGL Carbon*, namely to reorganize in order to stay in business.  Rather, the Debtor-Appellant seeks to entrench representatives of some shareholders into management by preventing the Board Stacking Right and to term out the redemption of the Preferred Stock over five years.   While the company may have been struggling financially in a difficult real estate market, there has been no action taken by any creditor, nor is there an imminent foreclosure or sheriff's sale on the horizon or any other similar scenario that might validate the filing of the Chapter 11 Case.   The Debtor-Appellant was merely trying to avoid the Chancery Court hearing on its own motion for preliminary injunction for fear of a bad result.  The Debtor-Appellant's  true motivation can be seen by the proposed treatment of Preferred Stock under the Plan, where the Debtor-Appellant seeks to pay PPH over five years and completely eviscerates any and all rights that PPH has under the Certificate.

18.     The Debtor-Appellant is not likely to succeed on appeal.  As early as the First Day Hearing, the Bankruptcy Court recognized that "this is a dispute between yourself, debtor, and the debtor's preferred shareholder over control, equity control, of an entity."   *See* September 2, 2010 Transcript of Proceedings before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge ("First Day Tr."), 6:16-6:18.  A copy of the First Day Tr. is attached hereto as Exhibit H.  The Bankruptcy Court also determined that the status of PPH as preferred shareholder was irrelevant, and that the outcome would be the same regardless of whether PPH was "a preferred shareholder, a shareholder or a secured creditor…This case would be ripe for dismissal as a 'bad faith filing' because in effect it's a two-party dispute." *See* September 7, 2010 Transcript of Proceedings before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge ("Sept. 7 Tr."), 9:3-9:12.  A copy of the Sept. 7 Tr. is attached hereto as Exhibit I. Furthermore, the record is clear that there is no action being taken by any creditor, nor is there an imminent foreclosure or sheriff's sale on the horizon, there is no lender refusing to advance credit for working capital, nor any other similar scenario that might validate the Chapter 11 filing.

19.     However, all of the testimony demonstrated that the purpose of the bankruptcy filing and the Chancery Court Action were to obtain leverage over the preferred shareholder in an attempt to induce the preferred shareholder to compromise or surrender its rights for the benefit of the common shareholders/directors.  Each of the Debtor-Appellant's witnesses testified as to such purpose.

20.     Mr. Dirk Junge, the Chairman of the Board of Directors of the Debtor-Appellant testified with respect to the bankruptcy filing:

> A.   And the seriousness of the filing under Chapter 11 was only taken on as we were ***not able to arrive at an agreement through mutually satisfying terms of the board with the preferred*** to be able to preserve the interest that we believe are there should we be able to restructure and have additional time to deliver on all of the obligations that are due.

*See* September 3, 2010 Transcript of Proceedings before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge ("Sept. 3 Tr."), 12:18-12:23 (emphasis added). A copy of the Sept. 3 Tr. is attached hereto as Exhibit J.

Mr. Junge went on to testify relating to the Chancery Court Action:

> Q.   I was going to ask, you know, why did the – what was the debtor trying to accomplish and, you know, why did the debtor bring that litigation [Chancery Court Action]?
>
> A.   This was an additional attempt to bring some objectivity to us being able to have additional time ***to be able to come to an agreement with the preferred*** that would allow us to -- as mentioned, to take care of my fiduciary duty and protect the interests of all constituents. So this was done as a effort to have some additional time and additional ability for us to have the preferred come to the table to discuss the interests of the preferred and the common and the other interested parties of Pitcairn Properties Holdings, Inc.

*See* Sept. 3 Tr., 14:7-14:18. (emphasis added).

Robert Roy, a member of the Debtor's board testified that:

> Q.   And could you describe to the Court from your perspective why the debtor chose to file a voluntary petition under Chapter 11?
>
> A.   ***After being unable to arrive at satisfactory agreement with the preferred***, exhausting all opportunities that we thought we had, we chose this as the last opportunity that we had to preserve the viability of the entity and preserve all the value for all of the constituents.

*See* Sept. 3 Tr., 30:16-30:23 (emphasis added).

Mr. Roy later testified with respect to the Chancery Court Action:

| | |
|---|---|
| Q. | And were you also involved in the decision to commence and prosecute the Chancery Court Action? |
| A. | Yes. |
| Q. | And what was the purpose – the goal of that action? |
| A. | ***To be able to come to some type of settlement with the preferred***, to be able to restructure the company. |

*See* Sept. 3 Tr., 31:17-31:22 (emphasis added).

James Junge testified that:

| | |
|---|---|
| Q. | Okay.  I want to move on from the C.B. role and talk about the Chapter 11 process and the Chancery litigation.  Were you a part of the decision to start that litigation? |
| A. | Yes, I was. |
| Q. | And what was the goal of bringing that litigation? |
| A. | We're talking about the Chapter 11 – |
| Q. | No, we're talking about the State Court case, the Chancery Court case, the lawsuit by the company against the preferreds and Mr. Blum. |
| A. | We had been unsuccessful in getting the representatives of the preferred to sit down and talk with us, or at least we had been unsuccessful in getting anything that we could live with that wouldn't destroy the company. |
| Q. | So the purpose of the litigation was – |
| A. | Was to get them to the table. |

*See* Sept. 3 Tr., 43:15-44:4.

Finally, the Debtor-Appellant's last witness, Salah Mekkaway testified that:

| | |
|---|---|
| Q. | And you heard them describe the interviews – the purposes of the State Court litigation that was commenced and the purposes of this Chapter 11 case? |
| A. | I did. |
| Q. | And do you agree with what they said? |
| A. | I do. |

*See* Sept. 3 Tr., 53:22-54:2.

21.     These witnesses comprise all of the Debtor-Appellant's witnesses and

each testified that the Chancery Court Action and the Chapter 11 Case were filed to

obtain leverage over the preferred shareholder in negotiations, which supports a finding of bad-faith.

22.     Furthermore, each of the Debtor-Appellant's witnesses have either a common equity stake in the Debtor-Appellant, or are employed by parties with a common equity stake in the Debtor-Appellant, thus providing each with a potential personal benefit in preserving their control of the entity and thus their leverage on negotiating for the benefit of the common equity against the benefit of the preferred.  Additionally, at least two directors have borrowed substantial sums of money (in excess of $13 million in the aggregate) from the Debtor-Appellant under questionable circumstances either individually or through entities they own on account of insider loans.  These loans either remain outstanding or were purportedly repaid in part under questionable circumstances. This further evidences a motivation to remain in control of the Debtor-Appellant and forestall any exercise of the Board Stacking Right.  For example:

Mr. Dirk Junge testified:

> Court.   Do you own any equity in the company?
> A.          I do, Your Honor.
> Court.   Thank you.
> A.          And I also am the chairman of the general partner, Pitcairn
>             Group, LP that has a substantial equity interest.

*See* Sept. 3 Tr. 19:20-19:25.

Mr. Robert Roy testified that:

> Q.     Mr. Roy, are you employed by the Davis family?
> A.      I am.
> Q.     Okay. In what capacity?
> A.      I'm the executive director.
> Q.     Okay.  What is the Davis family?
> A.     It is a family in Massachusetts.
> Q.     Okay.  And are they the holders of common stock of the
>        company?

PHIL1 1221008-5

A.      They are one of the holders of common stock in the company.

Q.      But for your relationship and your employment by the Davis family, would you otherwise be a member of the board of this company, the debtor?

A.      Probably not, no.

*See* Sept. 3 Tr. 34:3-34:16.

Mr. James Junge testified that:

A.      … All Pitcairn interests are only about 22 percent, my personal interest and my families' interest are part of that…

*See* Sept. 3 Tr., 46:1-46:3.

Q.      Are you aware of a $9 million loan to Mr. McCartle?

A.      I don't know what the total amount of the obligation is, but I am aware of that.

*See* Sept. 3 Tr., 25:21-25:23.

Mr. Mekkaway testified that:

Q.      Can you tell the Court how much money either you or entities you control owe to the company?

A.      I currently do not owe the company.  I have paid my debt to the company.

Q.      Do you own an interest in – isn't it true that you own an interest in any entity that has a real estate development in Lake Wallenpaupack?

A.      That's correct.

Q.      Okay.  Didn't that entity borrow money from the debtor?

A.      Pitcairn has an option to invest into this company.

Q.      Okay.

A.      And Pitcairn funded a certain amount of money while we are being the developer.

Q.      And it's in excess of a million dollars?

A.      It's $1.2 million.

Q.      Okay.  And that's not been repaid, has it?

A.      No, it has not.

*See* Sept. 3 Tr. 60:24-61:15.

PHIL1 1221008-5

23.     The evidence of the purpose of the bankruptcy filing, the purpose of the Chancery Court Action, and the personal interest of Debtor-Appellant's board overwhelmingly support the Bankruptcy Court's finding of bad faith based upon a litigation tactic.  Accordingly, the Debtor-Appellant did not and cannot meet the burden of proving that the Chapter 11 filing was anything other than a litigation tactic and, therefore, the Bankruptcy Court correctly dismissed the Chapter 11 Case as a bad faith filing under 11 U.S.C. § 1112(b).  The Bankruptcy Court recognized that in order to be considered a "good faith" filing, "a case has to have two purposes or has to meet two criteria…A proper reorganization purpose and not having been filed as a litigation tactic. The debtor has not satisfied on the record before the Court either of those provisions." *See* Sept. 7 Tr., 107:4-107:10.

**B.     *Remand and Stay Relief Order***

24.     Remand of removed actions is governed by 28 U.S.C. § 1452(b) which provides that remand may be granted on "any equitable ground."  The Third Circuit has held, that the term equitable "is not to be understood as distinguishing equitable from legal grounds in a traditional sense, but instead, equitable signals what is reasonable, fair or appropriate." *Geruschat v. Ernst Young LLP (In re Seven Fields Development Corp.),* 505 F.3d 237, 245 (3d Cir. 2007) (*citing Allied Signal Recovery Trust v. Allied Signal, Inc.,* 298 F.3d 263, 268 (2d Cir. 2002)).  "The standards for abstention, whether mandatory or permissive, are applicable to a remand motion." *In re Tarragon Corp,* Case No. 09-01465, 2009 WL 2922308 at *4, (Bankr. D.N.J. Aug, 13, 2009).  Once a court has determined that "either it must abstain from hearing a removed case pursuant to §1334(c)(2), or should abstain pursuant to §1334(c)(1)'s permissive abstention

provisions, it can consider whether there is reason for the suit to proceed in state court.  If

so there will be an equitable ground justifying remand under § 1452(b)." *Stoe v.*

*Flaherty,* 436 F.3d 209, 215 (3d Cir. 2006); *see also In re Mid-Atlantic Handling*

*Systems, LLC,* 304 B.R. 111, 120 (Bankr. D.N.J. 2003) ("where grounds for mandatory or

discretionary abstention are present, remand is proper"), *Balcor/Morristown Ltd.*

*Partnership v. Vector Whippany Associates,* 181 B.R. 781, 788 (D.N.J. 1995) ("where

abstention is appropriate, or required, remand will follow"), *In re Micro Design, Inc.,* 120

B.R. 363, 366 (E.D. Pa. 1990) (same).   As discussed in further detail below, both

mandatory and permissive abstention are appropriate in this case and justify the remand

of the Chancery Court Action.

     25.    The Bankruptcy Court clearly and correctly determined that there were

ample grounds to remand a two-party dispute back to the Chancery Court, the correct

forum to hear this dispute, finding as follows:

> The fight over the board stacking provision that is in front of Vice
> Chancellor Laster, or was, is, in effect, a battle between various groups of
> shareholders for control of the board of directors or the debtor.  As such,
> it's critical to be resolved even in the context of an ongoing bankruptcy,
> because under Delaware law, the board of directors is the management --
> is charged with the management of the affairs of the debtors. They then
> direct management.

*See* Sept. 7 Tr., 101:19-102:1.

> The point being that what's going on in Chancery, I think, isn't a
> debtor/creditor fight as much as it's a shareholder fight and a board fight.
> In addition, there are other creditors. But in the grand scheme of the
> current status of the debtor, they really are de minimis to a certain extent.

*See* Sept. 7 Tr., 103:9-103:14.

> I think remand would be completely appropriate here. I believe that we
> have to have a decision in this case as to whether the board stacking
> provision is enjoined or not, because it will have a direct effect on who

> controls the affairs of this company. So as a preliminary matter, I'm going to remand the case under 28 U.S.C. 1452(b), effective immediately.  In addition, I am going to lift the automatic stay, to the extent it is applicable, to allow that litigation to go forward in complete -- to go forward unimpaired, if you will, from the automatic stay.

*See* Sept. 7 Tr., 106:7-106:17.

26.     The Debtor-Appellant makes no argument about its probable success on the merits on appeal with respect to remand or stay relief for a good reason, there are no articuable bases to maintain the Chancery Court Action in Bankruptcy Court.   The Chancery Court Action is a hollow attempt by the Debtor-Appellant's management to preserve their control over the Debtor for their personal benefit.   When an adverse decision became imminent in the Chancery Court Action, the Debtor-Appellant's management filed the Chapter 11 Case in attempt to shop for a more favorable forum.  As the Bankruptcy Court determined, the actions of the Debtor-Appellant dictate that the Chancery Court Action should be remanded to the Chancery Court.

**2.      THE APPELLANT WILL NOT SUFFER IRREPARABLE INJURY IF THE STAY IS NOT GRANTED**

27.     No actual harm to the Debtor-Appellant, rather than its board or management, will arise should this Court deny the debtor's request.  Any alleged harm that might arise should the stay not be granted would not befall the Debtor-Appellant; rather, any harm of the type the Debtor-Appellant complains would be to the Debtor-Appellant's existing board and management, so the requisite standard (harm to the appellant) cannot be met in the first instance.  In its Memorandum, the Debtor-Appellant continues to revisit its position that PPH's exercise of its Board Stacking Right will cause the immediate demise of the Debtor-Appellant.  This is simply not the case.  If PPH chooses to exercise its Board Stacking Right, it will carry a majority of the Board, but

this fact in and of itself does not cause the harm that Debtor-Appellant articulates. In addition to the new Board members appointed by PPH (should PPH choose to exercise its rights) the current members of the Board will remain, and all members will have the same fiduciary duties as the current Board. As the Court noted at the First Day Hearing, the Debtor-Appellant's entire "position is premised on the belief that the preferred shareholder is going to take control and immediately breach its fiduciary duties. There's no evidence that would indicate that's […] a valid surmise." *See* First Day Tr., 104:25-105:4. "I don't view this fear that the preferred shareholder will take precipitous action in violation of its fiduciary duty to be a valid reason to file Chapter 11 in order to keep that entity from taking control." *Id.*, 106:1-106:4.

28.     At the telephonic hearing on the Debtor-Appellant's Oral Motion for Stay, the Bankruptcy Court repeatedly found that the Debtor-Appellant did not meet its burden of proving that it would suffer irreparable harm should its Motion be denied:

> Court:  There's nothing in the record, I think, that would fairly indicate that a change in control of this corporation's board by exercise of the board stacking would in and of itself result in any irreparable harm to the debtor's estate, nor I think is it fair to draw an implication, because none is supported by the record, that a new board would be inclined to breach its fiduciary duties in the interest of a quick, cheap liquidation.

*See* Sept. 7 Tr., 7:23-8:5.

> Court: And again, there's nothing in this record that would indicate that something disastrous is going to befall this company in the event the board stacking provision is exercised.

*See* Sept. 7 Tr., 8:16-8:19.

> Court: [In addition], I don't believe there's any risk whatsoever of irreparable harm befalling the debtor's estate.

*See* Sept. 7 Tr., 9:20-9:21.

> Court: …the standard of course is for the person seeking the stay pending appeal to carry the burden.

*See* Sept. 7 Tr., 9:24-9:25.

29.     Furthermore, not a single contract default of any agreement of the Debtor-Appellant will be triggered by the exercise of the Board Stacking Right. However, numerous agreements of the Debtor and or its affiliates are triggered by the filing of the Debtor-Appellant's Chapter 11 Case.  In fact, the filing of the Chapter 11 Case has caused at least one party (Wells Fargo Bank/Wachovia Bank) to stop finalizing a agreement with the Debtor-Appellant that was in process prior to the Petition Date.  The real harm is to the single, largest stakeholder in the Debtor-Appellant, PPH, whose investment in the Debtor-Appellant dwarfs any other constituent and is the holder of the only real equity value of the enterprise.

**3.     <u>GRANTING A  STAY PENDING APPEAL WOULD HARM PPH</u>**

30.     Granting of the stay requested by the Debtor-Appellant would harm PPH by preventing the preferred shareholder from exercising its bargained for rights.  "You can't deny the fact that…[PPH] put $50 million into this corporation and under that agreement to purchase preferred stock they were given certain rights and remedies."  *See* Sept. 7 Tr., 7:20-7:23. The Board Stacking Right granted to PPH in the Certificate obligates the Debtor-Appellant to redeem PPH's stock and, when it did not, PPH notified the Debtor-Appellant of its right to exercise the Board Stacking Right.  Depriving PPH of its bargained for shareholder rights set forth in the Debtor-Appellant's Charter for an additional period of time is harmful to PPH and would result in a de facto preliminary injunction against PPH without the substantive review on the merits that is immediately available in the Chancery Court.

4.    **PUBLIC INTEREST**

31.    To the extent there is a public interest implicated by this Motion, it is in ensuring that corporate management cannot entrench itself and frustrate the rights of its shareholders to direct the business of corporations and cannot abuse the extraordinary procedural advantages of the Bankruptcy Code for the purpose of delay and leverage in a private dispute.   A denial of the Debtor-Appellant's Motion, would merely allow this private, two-party dispute to play out in the appropriate forum

32.    Upon consideration of each of the applicable factors, it is clear that the Debtor-Appellant cannot meet its burden of proving the need for stay pending appeal.

PHIL1 1221008-5

WHEREFORE, the Appellees respectfully request that for the reasons set forth herein and in the *Statement of Position Relating to Order to Show Cause* filed by the Appellees in the Bankruptcy Court [Bankruptcy Court D.I. 16], a copy of which is attached hereto as <u>Exhibit K</u>, this Court deny the Debtor-Appellant's Motion and grant all and any other relief it deems appropriate.

Dated: September 15, 2010     KLEHR HARRISON HARVEY
       Wilmington, Delaware     BRANZBURG LLP

                     By:       */s/ Domenic E. Pacitti*
                           Domenic E. Pacitti (Del. Bar No. 3989)
                           Michael W. Yurkewicz (Del. Bar No. 4165)
                           Margaret M. Manning (Del. Bar No. 4183)
                           919 Market Street - Suite 1000
                           Wilmington, DE 19801-3062
                           (302) 426-1189

                           - and -

                           William A. Harvey
                           Daniel P. O'Brien (Del. Bar No. 3527)
                           Glenn A. Weiner
                           1835 Market Street – Suite 1400
                           Philadelphia, PA 19103
                           (215) 569-2700

                           Counsel for PPH Investments, LLC, PPH Investment Management, LLC, Eric L. Blum, ELB Capital Management, LLC, FB Capital Partners, L.P., and Marsh Hawk Capital Management LLC